## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SAM MALONE and | ) | |
| DONALD BROWN, individually | ) | |
| and on behalf of others similarly situated, | ) | |
| | ) | **CASE NO. 22-CV-3572** |
| **Plaintiffs,** | ) | |
| | ) | **Judge Georgia N. Alexakis** |
| v. | ) | |
| | ) | |
| ASAP TRANS CORP. and | ) | |
| KRISTINA PETROSIUS, | ) | |
| | ) | |
| **Defendants.** | ) | |

## FOURTH AMENDED COMPLAINT

Plaintiffs Sam Malone ("Malone") and Donald Brown ("Brown")[1] complain against

Defendants ASAP Trans Corp. ("ASAP") and Kristina Petrosius ("Petrosius") alleging claims

under the Truth in Leasing Act ("TILA"), 49 U.S.C. § 14704(a)(2); the Illinois Wage Payment and

Collection Act ("IWPCA"), 820 ILCS 115/9; and the Illinois common law of contract.[2] Plaintiffs

Malone and Brown bring their claims as a putative class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure.

### Introduction

1.      The Truth in Leasing Act ("TILA"), 49 U.S.C. § 14102(a), and its implementing

regulations govern the terms and conditions under which owner-operator truckers lease equipment

---

[1] Zahidullah Rahmati was previously a Named Plaintiff. The Court dismissed his claims in May 2024. *See* ECF No. 141.

[2] The Court previously dismissed Plaintiffs' claims for fraud. ECF No. 141. By not repleading those claims here, Plaintiffs do not intend to waive their right to challenge the dismissal of those claims on appeal. *See Bastian v. Petren Res. Corp.*, 892 F.2d 680, 683 (7th Cir. 1990) ("It is not waiver—it is prudence and economy—for parties not to reassert a position that the trial judge has rejected.").

to federally-authorized motor carriers that transport freight in interstate commerce. *See* 49 C.F.R. § 376.12. TILA regulations require the motor carrier's equipment lease to state clearly, in writing, the amount that the motor carrier will pay the owner-operator as compensation. 49 C.F.R. § 376.12(d). Finally, the regulations require the motor carrier to adhere to the terms of the lease. *Id.* § 376.12 (introductory paragraph).

2.      The TILA also provides that "no person shall aid, abet, encourage, or require a motor carrier or its employees to violate the rules of [the TILA]." 49 C.F.R. § 390.13. Individuals who aid, abet, and encourage the violations can be held liable in their individual capacities. *See Porter v. T&T Farms, Inc.*, No. 21 C 529-JD-MGG, 2022 WL 1746927, at *4 (N.D. Ind. May 27, 2022).

3.      Plaintiffs allege that ASAP violated the TILA by paying Malone significantly less than his equipment lease required for each load he transported. ASAP promised to pay Malone and other owner-operator drivers a certain percentage of the "revenue rate," or price, of each load, but ASAP lied to them about that price, so it could pay them less than the lease required.

4.      Petrosius violated the TILA by directing her employees to lie to drivers about the real price of each load so that ASAP could pay them less than the drivers' leases required.

5.      ASAP's lies to Malone and other owner-operator drivers to conceal the true amount owed to them also constitute fraud.

6.      Plaintiffs allege that Defendants also violated the IWPCA by making deductions from the wages of Malone and Brown without their written consent at the time the deductions were made.

## Parties

7.  Plaintiff Sam Malone worked as a truck driver for ASAP from January 2022 until May 2022. During all times that Malone worked for ASAP, he was not an agent for purposes of the TILA. Malone is a Texas resident.

8.  Plaintiff Donald Brown worked as a truck driver for ASAP from October 2019 to October 2022. Brown is an Illinois resident.

9.  Defendant ASAP is an Illinois corporation headquartered in Homer Glen, Illinois. ASAP is a transportation carrier licensed with the U.S. Department of Transportation. It contracts with and employs drivers to transport its customers' freight in interstate commerce.

10.  Defendant Kristina Petrosius is the founder, owner, and president of ASAP. Petrosius is an Illinois resident.

## Facts

11.  Certain ASAP drivers, called owner-operator drivers, used their own semi-tractors to perform their work. They either owned their own trucks or leased their trucks from a third-party.

12.  ASAP and owner-operator drivers agreed to split the revenue ASAP received from freight brokers for the loads the drivers hauled.

13.  From approximately January 2022 until May 2022, Malone performed line haul work for ASAP across several states. He worked for ASAP as an owner-operator for purposes of the TILA regulations. 49 C.F.R. § 376.2.

14.  Over the past three years, ASAP has contracted with and employed well over 100 owner-operators to provide transportation services for its clients.

15.  Malone and other owner-operator drivers signed contracts with ASAP (the "Lease Agreement") with substantially identical leasing and payment provisions.

16.     The Lease Agreement between the owner-operator drivers and ASAP served as the "equipment lease" required by regulations promulgated by the TILA, 49 C.F.R. § 376.12.

17.     As such, the owner-operator drivers leased their equipment (a semi-truck tractor) to ASAP, and ASAP contracted with freight brokers for loads that drivers hauled.  For each load, ASAP and the owner-operator drivers agreed to split the revenue paid by the freight broker. Drivers received a larger percentage for actually hauling the load, while ASAP received a smaller percentage akin to a "finder's fee" for finding and negotiating the load agreement with the broker.

18.      Malone's contract, for example, promised an 82% rate of the revenue, as adjusted and agreed to by ASAP and the freight broker, for each load Malone hauled for ASAP. *See* Exhibit A (Malone Contract) at A-1; Exhibit B (Rahmati Contract) at A-1.

19.     In the alternative, Malone's contract promised 82% of the revenue for each load Malone hauled for ASAP subject to the adjustments agreed to by Malone and ASAP in their equipment leases—for example, for fuel. *Id.*

20.      In any case, the 82% rate included in Malone's contract referred to the percentage of the actual revenue ASAP received from the freight brokers for loads Malone hauled.

21.     It is a standard practice in the trucking industry for owner-operators to be paid a percentage of the total revenue received from the freight broker by the carrier company.

22.     The TILA regulations specifically identify payment "as a percentage of gross revenue" as one of the means by which owner-operators may be compensated. *See* 49 C.F.R. § 376.12(d) ("The amount to be paid may be expressed as a percentage of gross revenue, a flat rate per mile, a variable rate depending on the direction traveled or the type of commodity transported, or by any other method of compensation mutually agreed upon by the parties to the lease.").

23.     It was Malone's understanding at the time he entered into his lease, and throughout his time driving for ASAP, that ASAP was required under the leases to pay Malone 82% of the total revenue ASAP received from freight brokers for the loads Malone hauled (less specific agreed-upon deductions, such as for fuel).

24.     In order to retain an even greater percentage of the revenue than the agreed-to percentage, ASAP intentionally lied to owner-operator drivers and under-reported the revenue (or price) of the loads. ASAP's dispatchers, including Olena Petrenko and Renata Gurcinas, lied to drivers about the revenue the brokers were paying for loads before the drivers hauled them, and ASAP's accountants, including Natalia Zhogol, furthered the lie by including the false revenue amount in drivers' pay statements.

25.     ASAP directly pocketed the portion of the revenue from the broker that they concealed from each owner-operator driver, and paid drivers their promised portion, e.g. 82%, on the lower, underreported amount.

26.     For example, if the total price paid by a broker for a load was $1,500, ASAP might pocket $500 directly and pay the driver 82% of the remaining $1,000—$820, or 55% of the actual revenue.

27.     ASAP never told owner-operator drivers that it was paying them for their loads based on revenue rates below the rates agreed to between ASAP and the freight brokers.  Rather, ASAP's dispatchers represented to drivers that the rates they were offering for each load (and on which the drivers' pay would be based) were the rates offered by the freight brokers.

28.     When owner-operator drivers asked to see documentation, such as broker rate confirmation sheets, to support the revenue rates ASAP was claiming to receive for loads, ASAP often refused to provide the requested documents.

29.     Other times, ASAP provided sheets that showed the delivery and pickup address for the loads but omitted the agreed revenue rate.

30.     Sometimes in response to requests for documents, ASAP provided the owner-operator drivers knowingly false and fabricated rate confirmation sheets to make it appear that the brokers had agreed to pay rates much lower than they actually paid ASAP.

31.     For example, on April 12, 2021, ASAP dispatcher Olena Petrenko sent Malone, via text message, a rate confirmation sheet that appeared to be from freight broker C.H. Robinson. The rate confirmation sheet sent by Petrenko showed that C.H. Robinson would pay $2,000 for load number 394323716—a load to be picked up from Bristol, Indiana on April 12, 2021 and to be delivered in Dahlonega, Georgia on April 13. *See* Exhibit C. But the load price on the rate confirmation sheet sent by Petrenko was false; Petrenko had altered the price to deceive Malone. On the actual rate confirmation sheet C.H. Robinson provided to ASAP for load number 394323716, the price was listed as $2,400. *See* Exhibit D.

32.     Later that day, Petrenko sent Malone another text message showing a rate confirmation sheet that appeared to be from C.H. Robinson. That rate confirmation sheet showed that C.H. Robinson would pay $1,500 for load number 3951232357—a load to be picked up from Atlanta, Georgia on April 13, 2021 and to be delivered in Atlanta, Texas on April 14. *See* Exhibit E. That load price had also been altered by Petrenko to deceive Malone. The actual rate confirmation sheet C.H. Robinson provided to ASAP for load number 3951232357 listed the load price as $1,610. *See* Exhibit F.

33.     On April 21, 2021, Petrenko sent Malone, via text message, another false and altered rate confirmation sheet purported to be from C.H. Robinson. This rate confirmation sheet showed that C.H. Robinson would pay $3,100 for load number 395435121—a load to be picked

up from Houston, Texas on April 21, 2021 and to be delivered to Chicago on April 22. *See* Exhibit G. The load price had, once again, been altered by Petrenko to deceive Malone. The actual rate confirmation sheet C.H. Robinson provided to ASAP for load number 3951232357 listed the load price as $3,500. *See* Exhibit H.

34.     Malone and other owner-operators leased their trucks to ASAP in Illinois and had to return their trailers to ASAP's Illinois truck yard when they finished driving for ASAP.

35.     ASAP and its dispatchers negotiated the revenue rates, or prices, with freight brokers from ASAP's offices in Illinois.

36.     ASAP and its dispatchers lied to drivers about the actual revenue rates they received from freight brokers, and sent false and fabricated rate confirmation sheets to drivers, from ASAP's offices in Illinois.

37.     In May 2022, Malone discovered that ASAP was lying and under-reporting the revenues of loads and thus paying him less than the amount required by his equipment lease with ASAP.

38.     That month, Malone hauled a load containing nearly 37,000 pounds of pallets from Mechanicsburg, Pennsylvania to Stone Mountain, Georgia. ASAP reported to Malone that the rate for the load from the broker was $1,800, from which Malone would be paid 82% or $1,476. The day after delivering the load, however, Malone spoke to a representative from Pegasus who had brokered the load and who confirmed to Malone that the actual price paid to ASAP for the load was $2,100.

39.     ASAP also deducted $2,500 from Plaintiffs and each of the other drivers to be kept in escrow as a "security deposit."

6

40.     By lying to owner-operator drivers about the revenue rates for their loads, ASAP fraudulently withheld substantial sums owed to drivers pursuant to their work agreements. Had the drivers known the true revenue rates offered for the loads, they would not have continued driving for ASAP unless ASAP paid them based on the actual rate. For those owner-operator drivers with equipment leases, ASAP's failure to pay the promised compensation amount and lies to conceal the true amount owed violates the TILA. For all ASAP drivers who were paid based on a percentage of revenue, ASAP's failure to pay the promised compensation constitutes a breach of contract, and its lies to conceal the true amount owed constitute fraud.

41.     Petrosius directed ASAP employees to lie to drivers about the real price of the load they hauled so that ASAP could pay them less than their leases required.

42.     In addition to the owner-operator drivers, ASAP also employed drivers, like Plaintiff Brown, who drove trucks that ASAP owned and provided to the drivers. Like the owner-operator drivers, Plaintiff Brown hauled loads for ASAP nationwide. He was paid on a per-mile basis at a rate of $0.70 per mile driven hauling loads for ASAP.

43.     Plaintiffs Malone and Brown were employees of ASAP for purposes of the IWPCA.

44.     Dispatchers for ASAP offered Plaintiffs work transporting loads and gave them the information they needed to do their work picking up and delivering loads by text message or email.

45.     Plaintiffs picked up, drove in, and delivered loads in Illinois during the course of their working relationship with ASAP.

46.     ASAP exercised discretion and control over the performance of Plaintiffs' work by choosing which loads to offer Plaintiffs and directing Plaintiffs on the timing and locations of pick-ups and deliveries.

47.     ASAP also required Plaintiffs to enter into a "pre-employment agreement," which required Plaintiffs to adhere to certain requirements "before and during employment," including "Adher[ing] to all company policies." Exhibit I. Plaintiffs were required to follow ASAP's policies and procedures "as a condition of [their] employment with ASAP." Exhibit J. ASAP's requirements for Plaintiffs included requirements regarding trip paperwork, truck equipment, communications with dispatchers, and requests for vacation. Exhibit K.

48.     Plaintiffs performed work within the usual course of ASAP's business, which is transportation of goods in interstate commerce by truck and did not perform other types of work with ASAP.

49.     Plaintiffs did not perform their work outside the places of ASAP's business. For example, Plaintiffs hauled and delivered freight on Illinois roadways—locations that constitute ASAP's place of business.

50.     ASAP regularly deducted funds from Plaintiffs' and other drivers' wages, including deductions for escrow payments, occupational insurance, electronic logbook monitoring, International Fuel Tax Association fees, and "Admin Fees."

51.     In violation of the IWPCA, ASAP deducted these funds from Plaintiffs' wages without obtaining their express written consent at the time of deduction.

52.     Petrosius knew ASAP was deducting funds from Plaintiffs' wages without obtaining their express written consent at the time of deduction and permitted ASAP's employees to continue the practice.

**Class Allegations**

53.     Plaintiff Malone brings this action on behalf of himself and the following classes of other similarly situated individuals or entities:

8

**TILA Class:** All individuals or entities that signed equipment leases with ASAP between July 11, 2018 and July 11, 2022.

**Breach of Contract Class:** All individuals or entities that entered into written agreements with ASAP that required ASAP to pay them based on a percentage of the revenue received by ASAP for the loads they hauled between July 11, 2012 and July 11, 2022.

54.     Plaintiffs Malone and Brown also bring this action on behalf of themselves and the following class of other similarly situated individuals:

**IWPCA Class**: All individuals who drove semi-trucks for ASAP and had money deducted from their wages by ASAP without providing written authorization at the time of the deduction between July 12, 2013 and July 12, 2023.

55.     The Classes defined above satisfy the requirements of Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

56.     The Classes are so numerous that joinder of all members is impracticable, and the disposition of their claims in a class action will provide substantial benefits to both the parties and the Court. Since July 11, 2018, ASAP has contracted with hundreds of owner-operator drivers who signed equipment leases with the company, and since July 11, 2019, ASAP has contracted with hundreds of drivers that entered into written agreements with ASAP that required ASAP to pay them for driving based on a percentage of the revenue ASAP received for the loads the drivers hauled.

57.     Common questions of law and fact predominate over individual issues affecting only individual class members. Questions of law and fact common to the TILA Class include, among others, the following:

   a. Whether ASAP breached the terms of its equipment leases with owner-operator drivers, by paying them less than the promised percentage of revenue on each load.

9

58.     Questions of law and fact common to the Breach of Contract Class include, among others, the following:

    a.  Whether ASAP breached the terms of its written agreements with drivers, by paying them less than the promised percentage of revenue on each load.

59.     Questions of law and fact common to the IWPCA Class include, among others, the following:

    a.  Whether ASAP deducted money from drivers' wages without their express written consent at the time of the deduction.

60.     Plaintiffs Malone, and Brown will fairly and adequately protect the interests of all class members. Plaintiffs are members of each Class, and their claims are typical of the claims of all class members.

61.     Plaintiffs' interest in obtaining monetary relief for ASAP's fraudulent conduct and breach of its agreements is consistent with and not antagonistic to those of any person within the Classes. Plaintiffs have retained counsel competent and experienced in complex and class action litigation.

### Count I – Truth in Leasing Act
### (On behalf of TILA Class against ASAP and Petrosius)

62.     Plaintiffs incorporate all prior allegations as if fully stated herein.

63.     ASAP is a motor carrier licensed with the U.S. Department of Transportation. Plaintiffs worked for ASAP as owner-operators for purposes of TILA.

64.     Pursuant to the TILA regulations, ASAP signed an equipment lease with Malone and the other TILA Class Members.

65. Under the TILA regulations, an authorized carrier may perform authorized transportation in leased equipment only if the written lease granting the use of the equipment meets the requirements of 49 C.F.R. § 376.12.

66. The regulations require that the "amount to be paid by the authorized carrier for equipment and driver's services shall be clearly stated on the face of the lease or in an addendum which is attached to the lease." *Id.* § 376.12(d).

67. Under the regulations, the required lease provisions must be "adhered to and performed by the authorized carrier." *Id.* § 376.12 (introductory paragraph).

68. In the equipment leases, ASAP agreed to pay Malone and the other owner-operator drivers a certain percentage of the revenue received by ASAP for each load the drivers hauled for ASAP.

69. ASAP frequently underreported loads' revenue in order to pay Malone and the other owner-operator drivers less than the rate promised in their equipment leases.

70. ASAP did not adhere to the terms of its leases with owner-operator drivers.

71. To the extent ASAP maintains that it agreed to pay Malone and other owner-operators in some manner other than as a percentage of the total revenue received by ASAP for loads hauled by drivers for ASAP, the lease agreements with the owner-operators fail to "clearly state" the amount to be paid to the drivers, in violation of the TILA regulations.

72. Petrosius, as president of ASAP, encouraged and even required ASAP employees to underreport load revenue in order to pay Malone less than the amount owed to him under his equipment lease.

73.    Under 49 U.S.C. §14704(a)(2) and 49 C.F.R. § 390.13, ASAP and Petrosius are liable to Malone and the other owner-operator drivers for the damages that they suffered on account of ASAP's regulatory violations.

## PRAYER FOR RELIEF

Malone asks the Court to enter judgment against ASAP and issue an order:

    a.   Certifying this case as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure;

    b.   Appointing Malone as representative of the TILA Class;

    c.   Requiring ASAP and Petrosius to provide each of the TILA Class members an accounting of all transactions with ASAP and provide all documentation necessary to confirm the validity of the computations;

    d.   Entering judgment against ASAP and Petrosius for all damages that the TILA Class members incurred as a result of Defendants' violations of the Truth in Leasing Act regulations, including pre- and post-judgment interest; and

    e.   Awarding Plaintiffs' counsel their reasonable attorneys' fees and costs for their prosecution of this action, pursuant to 49 U.S.C. § 14704(e).

### Count II – Breach of Contract
### (On behalf of Breach of Contract Class against ASAP)

74.    Plaintiffs incorporate all prior allegations as if fully stated herein.

75.    Defendant ASAP entered contracts with Malone and other drivers that required ASAP, among other things, to pay the drivers based on a percentage of ASAP's revenue from loads the drivers hauled.

76.    Malone and other Breach of Contract Class members substantially performed all of their obligations under their contracts with ASAP.

77.    ASAP breached the contracts with Malone and other Breach of Contract Class members by underreporting the revenue ASAP received for each load in order to pay them less than the rate promised in their written agreements.

12

**PRAYER FOR RELIEF**

Malone asks this Court to enter judgment against Defendant ASAP and issue an order:

    a.   Certifying this case as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure;

    b.   Appointing Malone as representative of the Breach of Contract Class;

    c.   Appointing the undersigned counsel as class counsel;

    d.   Awarding Malone and Breach of Contract Class members all amounts due and owing to them under their contracts with Defendant ASAP;

    e.   Awarding Plaintiffs' attorneys their fees based on the percentage of the common fund method; and

    f.   Awarding such other relief as this Court deems just and proper.

**Count III – Illinois Wage Payment and Collection Act**
**(On behalf of IWPCA Class against ASAP and Petrosius)**

78.    Plaintiffs incorporate all prior allegations as if fully stated herein.

79.    Defendant ASAP entered contracts with Plaintiffs and other drivers that required ASAP, among other things, to pay the drivers an agreed amount per-mile driven on loads the drivers hauled or a percentage of ASAP's revenue from loads the drivers hauled.

80.    Plaintiffs were employees of ASAP for purposes of the IWPCA.

81.    Plaintiffs picked up and delivered loads in Illinois and used Illinois roads and tollways during their employment with ASAP.

82.    Plaintiffs were not free from ASAP's direction and control over the performance of their work.

83.    ASAP made deductions from Plaintiffs' wages without their express written consent to do so at the time of the deductions.

13

84.    At all relevant times, Petrosius was an officer of ASAP who knew that ASAP was deducting funds from Plaintiffs' wages without obtaining their express written consent at the time of deduction.

## **PRAYER FOR RELIEF**

Plaintiffs Malone and Brown ask this Court to enter judgment against Defendants ASAP and Petrosius and issue an order:

a.  Certifying this case as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure;

b.  Appointing Plaintiffs Malone and Brown as representatives of the IWPCA Class;

c.  Appointing the undersigned counsel as class counsel;

d.  Awarding Plaintiffs and IWPCA Class members all amounts ASAP unlawfully deducted from their wages;

e.  Awarding Plaintiffs and IWPCA Deductions Class members statutory penalties under 820 ILCS 115/14.

f.  Awarding Plaintiffs' counsel their reasonable attorneys' fees and costs for their prosecution of this action, pursuant to 820 ILCS 115/14(a).

g.  Awarding such other relief as this Court deems just and proper.

## **Jury Demand**

Plaintiffs demand trial by jury on all issues as to which a jury trial is available.

Respectfully submitted,

/s/ Christopher J. Wilmes
One of the Attorneys for the Plaintiff

Christopher J. Wilmes
Justin Tresnowski

14

HUGHES, SOCOL, PIERS, RESNICK & DYM, LTD.
Three First National Plaza
70 West Madison Street, Suite 4000
Chicago, Illinois 60602
312-580-0100