# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SAM MALONE and DONALD BROWN,
individually and on behalf of others
similarly situated,

        Plaintiffs,

    v.

ASAP TRANS CORP. and KRISTINA
PETROSIUS,

        Defendants.

No. 22 CV 3572

Judge Georgia N. Alexakis

### MEMORANDUM OPINION AND ORDER

Sam Malone and Donald Brown, on behalf of themselves and others similarly situated, are suing ASAP Trans Corp. and its president, Kristina Petrosius, for alleged violations of the federal Truth in Leasing Act, 49 U.S.C. § 14704(a)(2), and the Illinois Wage Payment and Collection Act, 820 ILCS 115/9. They have moved to certify two classes. The Court grants their motion with modifications.

## I.    Legal Standards

Class certification is governed by Federal Rule of Civil Procedure 23. A party seeking class certification under Rule 23 "bears the burden of demonstrating that certification is proper by a preponderance of the evidence." *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015). Failure to satisfy any of Rule 23's requirements precludes class certification. *Harriston v. Chicago Tribune Co.,* 992 F.2d 697, 703 (7th Cir. 1993).

Before certifying a class, the Court must "make whatever factual … inquiries as are necessary under Rule 23. *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). Nevertheless, class-certification proceedings are not a "dress rehearsal for the trial on the merits," and the Court can only evaluate evidence to decide whether certification is proper. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

## II. Background

These background facts come from the parties' pleadings and the exhibits the parties submitted with their class-certification briefs.

Defendant ASAP Trans Corp. is an Illinois corporation headquartered in Lemont, Illinois. Its founder, owner, and president, defendant Kristina Petrosius, is an Illinois resident. ASAP contracts with drivers and companies to haul freight across the country. [229] at ¶ 9. It pays some drivers on a per-mile basis and pays others by splitting the load revenue with drivers at an agreed-upon percentage. [326-1] at 31:3–8.

Plaintiff Sam Malone performed work as a driver for ASAP from January 2022 until May 2022. [229] at ¶ 7. He contracted to haul loads for ASAP in exchange for 82% of the load's "agreed … revenue rate." [224-1] at 24. ASAP drivers signed eight different types of contracts, *see generally* [237], and five of them had similar percentage-based compensation arrangements, *see* [237] at 28, 73, 118, 163, 207.

The parties dispute what "revenue rate" means. *See, e.g.*, [236] at 8. Plaintiffs contend that it means the amount that the freight broker paid to ASAP for the load. [229] at ¶ 20. Defendants believe that it means the amount to which the driver and

ASAP's dispatcher agreed. [253] at 20–21. Plaintiffs allege that ASAP lied to owner-operator drivers by under-reporting the amounts that brokers paid ASAP for each load. [229] at ¶ 24. Based on plaintiffs' proposed definition of "revenue rate," drivers' compensation was therefore less than it should have been because it was based on an amount less than the broker price of each load. [236] at 9; [229] at ¶ 40.

According to plaintiffs, it was a company-wide practice to pay drivers based on an amount that was different than the amount received from the broker. They maintain that dispatchers were paid 25% of the difference between the amounts ASAP was paid by freight brokers and the amounts on which drivers' compensation was based. [236-4] at 16:15–22; [236-5] at 44:10–45:19. Plaintiffs point to an ASAP spreadsheet documenting the amounts ASAP received from brokers for each load and the amount on which drivers' compensation was based for those same loads. [236-4] at 43:11–44:15; [236-5] at 36–46. Plaintiffs also allege that ASAP's president, defendant Petrosius, was aware of and encouraged the scheme. [229] at ¶ 72.

Plaintiff Donald Brown, an Illinois resident, worked as a truck driver for ASAP from October 2019 to October 2022. [229] at ¶ 8. He was paid on a per-mile basis rather than on a percentage basis. [229] at ¶ 42. ASAP required Brown, like Malone and all other drivers for ASAP, to follow several standard written rules. [224-9]; [224-10]. ASAP also made a number of regular deductions from the paychecks of its drivers to cover costs such as accident insurance, electronic logbooks, administration, repairs, and cleaning. [236-6] at 43:15–22; [236-10] at 38:15–19; [236-5] at 19:16–23; [237] at

¶ 10. ASAP classified all of its drivers as "independent contractors." [236-5] at 101:23–102:7.

Plaintiffs seek to certify a class, with Malone as class representative, to bring Truth in Leasing Act claims against ASAP and Petrosius for allegedly breaching the terms of percentage-based drivers' contracts by paying them based on amounts less than the amounts ASAP received from freight brokers for each load. They propose the following class definition, with the relevant type of contract denoted in parentheticals embedded within the class definition:

> All individuals who drove a truck[] for ASAP from January 1, 2021 to January 1, 2024 and signed an equipment lease in the form found at Bates Numbers ASAP014600-644 (Type 1), ASAP014645-691 (Type 2), ASAP014692-734 (Type 3), ASAP014735-780 (Type 4), or ASAP014796-803 (Type 7).

[236] at 15.

Plaintiffs also seek to certify a class, with Malone and Brown as class representatives, to bring Illinois Wage Payment Collection Act claims against ASAP and Petrosius for allegedly making deductions from drivers' paychecks without their express written authorization. They propose the following class definition:

> All individuals who worked for ASAP as a truck driver from January 1, 2018 to January 1, 2024 and had amounts deducted from their pay for occupational accident insurance, escrow, electronic logbook monitoring, admin fee, violations, citations, repairs, or truck cleaning.

*Id.*

## III. Analysis

To certify a class under Rule 23, plaintiffs must satisfy each of Rule 23(a)'s requirements and then show that they qualify for a particular type of class action

4

under Rule 23(b). Rule 23(a) provides four prerequisites for bringing a class action in federal court: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Plaintiffs have moved to certify classes under Rule 23(b)(3), [231] at ¶ 2, which provides two additional requirements: (1) predominance; and (2) superiority. *See* Fed. R. Civ. P. 23(b)(3). The Court will address each requirement in turn, but, because Rule 23(a)'s adequacy requirement frames the discussion, it will begin its analysis there.

### A. Adequacy

A class may only be certified under Rule 23 if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The "representative parties"—i.e., the named plaintiffs; here, Malone and Brown—are charged with representing absent class members, *see* Fed. R. Civ. P. 23(a), and the adequacy requirement considers "the adequacy of representation" they can provide "in protecting [class members'] different, separate, and distinct interest[s]." *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993). So "a class is not adequately represented if class members have antagonistic or conflicting claims." *Santangelo v. Comcast Corp.*, 15-cv-0293, 2017 WL 6039903, at *4 (N.D. Ill. Dec. 6, 2017) (cleaned up) (quoting *id.*). And "[t]he presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may … bring into question the adequacy of the named plaintiff's representation." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 731, 726 (7th Cir. 2011). The adequacy inquiry applies to the adequacy of both the named plaintiffs and plaintiffs' counsel.

*See Retired Chi. Police Ass'n*, 7 F.3d at 598 (citing *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986) (en banc)).

Defendants raise a number of issues related to the adequacy of the named plaintiffs.

### 1.    Arbitration and class-waiver issues

Defendants contend that Malone and Brown are not adequate class representatives because, unlike many members of the putative classes, they are not subject to contractual arbitration and class-waiver provisions. *See* [253] at 5, 7. Plaintiffs counter that "[t]he adequacy threshold is a low one," so the presence of those provisions in some putative class members' contracts needn't disqualify Malone and Brown as adequate representatives. [265] at 13 (quoting *Wallace v. Chi. Hous. Auth.*, 224 F.R.D. 420, 429 (N.D. Ill. 2004)).

The Court concludes that the arbitration and class-waiver provisions render Malone and Brown inadequate to bring class claims against ASAP, but not against Petrosius. Courts in this district and across the country have found named plaintiffs to be inadequate class representatives when some, but not all, class members' contracts contain arbitration or class-waiver provisions. *See, e.g.*, *Santangelo*, 2017 WL 6039903, at *4–*6 (striking class allegations because plaintiff, who wasn't subject to an arbitration agreement while other class members were, was inadequate representative); *Avilez v. Pinkerton Gov. Servs., Inc.*, 596 Fed. App'x 579, 579 (9th Cir. 2015) (holding that district court abused its discretion by certifying classes that included employees who signed class action waivers because plaintiff, who hadn't signed a waiver, was an inadequate class representative); *Jensen v. Cablevision Sys.*

6

*Corp.*, 372 F. Supp. 3d 95, 124–25, 131 (E.D.N.Y. 2019) (denying class certification for the same reason); *Eaton v. Ascent Resources-Utica, LLC*, Case No. 2:19-cv-03412, 2024 WL 1458457, at *6–*8 (redefining class to exclude putative members subject to arbitration agreements because named plaintiff, not subject to such an agreement, could not adequately represent them); *Johnson v. BLC Lexington, SNF, LLC*, Civil Action No. 5: 19-064-DCR, 2020 WL 3578342, at *7 (E.D. Ky. July 1, 2020) ("[Plaintiff] is not an adequate representative because she is not subject to a binding arbitration defense like other potential class members might be."); *cf., e.g.*, *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 861–63 (D. Md. 2013) (redefining class to exclude members subject to arbitration agreements because the agreements destroyed commonality, typicality, and predominance); *Renton v. Kaiser Foundation Health Plan, Inc.*, No. C00-5370RJB, 2001 WL 1218773, at *5–*6, *9 (W.D. Wash. Sept. 24, 2001) (denying class certification because arbitration agreements affecting some class members, but not named plaintiff, destroyed adequacy).

Here, the parties have identified eight different contract types signed by putative class members. [237] at 2 ¶ 8. The putative IWPCA class includes individuals who signed all eight, and the putative TILA class includes individuals who signed five of the eight. [237] at 15. Types 1, 4, and 5 contain no arbitration or class-waiver provisions. Type 2 contains an arbitration provision and a class waiver that apply to actions "brought against ASAP Trans Corp or its officers, directors and agents." [237] at 71. Types 3, 6, 7, and 8 each contain arbitration and class-waiver

7

Case: 1:22-cv-03572 Document #: 267 Filed: 10/22/25 Page 8 of 37 PageID #:5819

provisions that do not refer to ASAP's officers, directors, or agents. *See* [237] at 115, 198, 206, 218.

The number of contracts of each type and the arbitration and class-waiver provisions contained in each are summarized in the table below:

| Contract type | Number of contracts of this type[1] | Arbitration and class-waiver provisions applicable to ASAP only | Arbitration and class-waiver provisions applicable to ASAP and its officers | IWPCA class | TILA class |
|---|---|---|---|---|---|
| 1 | 7 | | | X | X |
| 2 | 55 | | X | X | X |
| 3 | 5 | X | | X | X |
| 4 | 10 | | | X | X |
| 5 | 10 | | | X | |
| 6 | 202 | X | | X | |
| 7 | 29 | X | | X | X |
| 8 | 139 | X | | X | |

The number of contracts from each putative class subject to arbitration agreements is summarized in the table below:

| Putative class | No arbitration or class-waiver provision | Arbitration and class-waiver provisions applicable to ASAP only | Arbitration and class-waiver provisions applicable to ASAP and its officers |
|---|---|---|---|
| TILA | 17 | 34 | 55 |
| IWPCA | 27 | 375 | 55 |

### a. Adequacy as to claims against ASAP

Malone and Brown did not sign contracts with arbitration or class-waiver provisions, so they cannot adequately represent the interests of class members who did. *See Santangelo*, 2017 WL 6039903, *4 (quoting *CE Design*, 637 F.3d at 726). The

---

[1] [237] at 2 ¶ 8.

arbitration and class-waiver provisions create higher barriers to recovery for the class members subject to them, but a judicial determination as to the provisions' enforceability will not affect recovery by Malone or Brown. They thus will have a structural incentive to trade on the rights of absent class members to their own advantage in any potential settlement with ASAP. *See id.* at *5 (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 595 (1997)).

Eighty-nine out of 106 members of the putative TILA class and 430 out of 457 members of the putative IWPCA class have signed contracts with ASAP containing arbitration and class-waiver provisions. *See supra* p. 8. That means that Malone and Brown cannot adequately represent 84% of the TILA class and 94% of the IWPCA class in their claims against ASAP. As a result, the Court will not certify either class with respect to those claims.[2]

Plaintiffs point out that two of the cases cited by defendants held that the plaintiffs were atypical, not inadequate. [265] at 19 (discussing *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d at 862; *Renton*, 2001 WL 1218773, at *7). This is a distinction without a difference. Numerous courts have found that arbitration and class-waiver provisions precluded class certification; many of those

---

[2] Defendants attempt to frame their argument in terms of Article III standing, asserting that Malone and Brown will be unable to challenge the validity of class members' agreements. Article III standing is beside the point, and the case they cite, *Rawat v. Navistar International Corp.*, No. 08-cv-4305, 2011 WL 222131 (N.D. Ill. Jan. 20, 2011), is inapposite. In *Rawat*, the court held that plaintiff lacked Article III standing to sue for a declaratory judgment on the validity of potential class members' contracts before the court brought those members into the action by certifying a class. *Id.* at *1. Here, the Court is considering the implications of arbitration and class-waiver provisions on the class-certification question, but is not issuing a declaratory judgment on their validity or enforceability.

decisions were based on adequacy; some were based on other Rule 23 requirements; others held that such provisions undermined *several* of Rule 23's requirements. *See, e.g.*, *Santangelo*, 2017 WL 6039903, at *4–*6; *Avilez*, 596 Fed. App'x at 579; *Jensen*, 372 F. Supp. 3d at 124–25; *Eaton*, 2024 WL 1458457, at *6–*8; *Johnson*, 2020 WL 3578342, at *7; *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d at 861–63; *Renton*, 2001 WL 1218773, at *5–*6, *9; *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 n.5 (2011) (observing that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge" and that "[t]hose requirements … also tend to merge with the adequacy-of-representation requirement"). The point is that arbitration and class-waiver provisions may make class certification impossible, and one way they may do that is by making a named plaintiff an inadequate class representative.

Plaintiffs attempt to distinguish another case cited by defendants by pointing out that, there, unlike here, the named plaintiff was the only person in the putative class not subject to an arbitration clause. [265] at 20 (discussing *Forby v. One Techs., LP*, No. 3:16-CV-856-L, 2020 WL 4201604, at *9 (N.D. Tex. July 22, 2020)). This does not affect the Court's conclusion, as there are many other cases in which arbitration and class-waiver provisions precluded adequacy, even when the named plaintiff was one of several putative class members not subject to such a provision. *See, e.g.*, *Jensen*, 372 F. Supp. 3d at 122 (denying class certification when plaintiff was one of approximately 200 customers who had opted out of an arbitration provision).

Plaintiffs also attempt to undermine the persuasive force of *Eaton*, 2024 WL 1458457, by pointing out that, there, the court originally granted class certification in spite of the presence of arbitration clauses in some putative class members' contracts. Only later did it modify the class when evidence showed that a majority of the leases at issue included arbitration clauses. [265] at 20 (discussing *id.* at *2, *6). This point also has no effect on the Court's analysis. Here, the evidence already shows that most of the contracts between putative class members and ASAP contain arbitration and class-waiver provisions, just as in *Eaton*, where the court modified the class based on later-available evidence that the majority of class members were subject to such provisions.

Plaintiffs also argue that *Jensen*, 372 F. Supp. 3d 95, *Santangelo*, 2017 WL 6039903, and another case[3] are not persuasive. [265] at 20–21. In those cases, they point out, plaintiffs had affirmatively opted out of arbitration agreements, which undermined their ability to credibly contest the enforceability of the provisions by arguing that class members felt compelled to agree or lacked notice of the provision. *Id.*; *see also Santangelo*, 2017 WL 6039903, at *5. Here, in contrast, Malone and Brown did not affirmatively opt out of arbitration or class-waiver provisions. But that does not change the fact that those provisions still create an incentive structure that makes Malone and Brown inadequate representatives. They have no reason to challenge the enforceability of provisions that do not bind them.

---

[3] *Tan v. Grubhub, Inc.*, No. 15-cv-05128-JSC, 2016 WL 4721439, at *3 (N.D. Cal. July 19, 2016).

11

Plaintiffs further argue that plaintiffs' inadequacy is "speculative," so the class should be certified until "the unlikely event that 'the conflicts prove real.'" [265] at 20–21 (quoting *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012)). Although there are cases—and plaintiffs cite two[4]—in which courts characterize likely future defenses as "speculative," courts may look ahead to future circumstances when determining whether class certification is appropriate. *Cf. CE Design Ltd.*, 637 F.3d at 726 ("The presence of *even an arguable defense* … may … bring into question the adequacy of the named plaintiff's representation.") (emphasis added); *In re Marriott International, Inc.*, 78 F.4th 677, 686 (4th Cir. 2023) ("[T]he time to address a contractual class waiver is before, not after, a class is certified. … Courts consistently resolve the import of class waivers at the certification stage— before they certify a class, and usually as the first order of business.") (collecting cases).

And, here, plaintiffs' inadequacy is not speculative, as is made clear by comparison with another case cited by plaintiffs, *Johnson v. Meriter Health Services Employees Retirement Plan*, 702 F.3d at 364. There, the court held that conflicts of interest based on class members' possible preferences were "too hypothetical to bar class certification" because the only evidence supporting the existence of the conflict was an expert witness's assertion that some class members "might" have had certain preferences. *Id.* at 372. Here, the conflict is not based on a mere assertion that some

---

[4] [265] at 21 (citing *Svoboda v. Amazon.com, Inc.*, No. 21 C 5336, 2024 WL 1363718, at *7 (N.D. Ill. Mar. 30, 2024); *Kessler v. Samsung Elecs. Am. Inc.*, No. 17-C-0082, 2019 WL 13165457, at *3 (E.D. Wis. Feb. 13, 2019)).

class members "might" have signed arbitration and class-waiver provisions; the evidence indicates that precisely 89 members of the putative TILA class and 430 members of the putative IWPCA class *did* sign those agreements. *See supra* p. 8, 9. This case, then, is less like *Johnson*, where inadequacy was held to be speculative, and more like *Santangelo*, 2017 WL 6039903, at \*4–\*6, *Avilez*, 596 Fed. App'x at 579, *Jensen*, 372 F. Supp. 3d at 124–25, and the many other cases in which courts have found that the existence of arbitration or class-waiver provisions precluded class certification.

Plaintiffs also propose an alternative course of action: modifying the class definition by excluding type 2 contracts, which "should sufficiently address any Rule 23 concerns," because only type 2 contracts have arbitration and class-waiver provisions that apply to both ASAP and its "officers, directors, or agents." [265] at 22; [237] at 71. And, they argue, since the claims against ASAP and Petrosius "would have the same relative value," [265] at 22–23, there is no structural conflict between class members with no arbitration and class-waiver provisions and those with arbitration and class-waiver provisions against ASAP but not Petrosius. This argument falls apart, however, because claims against Petrosius do not necessarily have the same value as claims against ASAP. To prevail in their TILA claims against Petrosius, plaintiffs must prove not only that ASAP violated the TILA, but also that Petrosius aided and abetted ASAP in so doing. *See* [236] at 12. Similarly, to prevail on their IWPCA claims against Petrosius, they must prove not only that ASAP violated the IWPCA, but also that Petrosius "knowingly permit[ted]" ASAP to violate

the IWPCA. *See id.* at 14. And there may be practical considerations, such as collectability or insurance issues, that affect the value of the claims.

To fully address the adequacy concerns with respect to claims against ASAP, then, the Court would have to exclude all contracts with arbitration and class-waiver provisions—including those that are arguably invalid or unenforceable, *see CE Design Ltd.*, 637 F.3d at 726. That would not be an appropriate solution. It would leave 17 members of the TILA class and 27 members of the IWPCA class; those classes would fail the Rule 23(a) numerosity requirement. *See Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017) ("[A] forty-member class is often regarded as sufficient to meet the numerosity requirement."). Even if those class members were spread across the country, they wouldn't—in light of recent developments in electronic communication, *see Value Drug Co. v. Takeda Pharm., U.S.A., Inc.*, Civil Action No. 21-3500, 2023 WL 2314911, at *14 (E.D. Pa. Feb. 28, 2023) (collecting cases)—be so numerous that joinder would be "impracticable." Fed. R. Civ. P. 23(a)(1); *see also Thornton v. Kroger Co.*, No. CIV 20-1040 JB/LF, 2023 WL 6378417, at *21 (D.N.M. Sept. 29, 2023) ("In determining whether a proposed class meets the numerosity requirement, … a court may make common sense assumptions to support a finding that joinder would be impracticable.") (cleaned up) (collecting cases).

Because plaintiffs cannot adequately represent putative class members in their claims against ASAP, and that adequacy problem cannot be appropriately cured

14

by modification of the class definition, the Court denies certification of the TILA and IWPCA classes with respect to claims brought against ASAP.

### b. Adequacy as to claims against Petrosius

Whether the arbitration and class-waiver provisions prevent plaintiffs from adequately representing putative class members in their claims against Petrosius depends on whether those provisions apply to claims against her in the first place. Plaintiffs contend that the arbitration and class-waiver provisions in contract types 3, 6, 7, and 8—which do not refer to ASAP's officers, directors, or agents—apply only to disputes between the parties to the contract—the putative class member and ASAP—and so do not apply to disputes between class members and Petrosius. [236] at 20–21. Defendants disagree, arguing that Petrosius can enforce the arbitration and class-waiver provisions because she is an "officer … of the signatory defendant corporation" and "the claims against the corporation and [her] [are] substantively the same." [253] at 8–9.

Plaintiffs are correct. "Traditional principles of state law" govern whether a contract, including an arbitration agreement or class waiver, is enforceable by a non-party to the agreement. *Arthur Andersen LLP v. Wayne Carlisle*, 556 U.S. 624, 631 (2009). "[A] litigant who was not a party to the relevant arbitration agreement may [compel arbitration] if the relevant state contract law allows him to enforce the agreement." *Id.* at 632. Here, Illinois law governs, since all four contract types contain either choice-of-law provisions applying Illinois law or, at a minimum, language stating that the contract "is drawn and executed in accordance with … the laws of … the State of Illinois." *See* [237] at 115, 198, 206, 218; *Beach Forwarders, Inc. v. Serv.*

15

*by Air, Inc.*, 76 F.4th 610, 613 (7th Cir. 2023) (giving effect to contract's choice-of-law provision). Defendants also do not suggest that anything other than Illinois law governs this analysis.

"Illinois courts recognize a 'strong presumption against conferring contractual benefits on noncontracting third parties.'" *Sosa v. Onfido, Inc.*, 8 F.4th 631, 639 (7th Cir. 2021) (citing *Marque Medicos Farnsworth, LLC v. Liberty Mut. Ins. Co.*, 427 Ill. Dec. 218, 117 N.E.3d 1155, 1159 (Ill. App. 1st 2018)). To overcome that presumption, "the implication that the contract applies to third parties must be so strong as to be practically an express declaration." *Id.* (citing *155 Harbor Drive Condo. Ass'n v. Harbor Point Inc.*, 209 Ill. App. 3d 631, 154 Ill. Dec. 365, 568 N.E.2d 365, 375 (Ill. App. Ct. 1991)). It is not enough to show that the "parties know, expect, or even intend that others will benefit from the agreement." *Id.* (citing *Marque*, 427 Ill. Dec. 218, 117 N.E.3d at 1159). Instead, for a nonparty to qualify as a third-party beneficiary, the language of the contract must show that "the contract was made for the direct, not merely incidental, benefit of the third person." *Id.* (citing *Martis v. Grinnell Mut. Reinsurance Co.*, 329 Ill. Dec. 82, 905 N.E.2d 920, 924 (Ill. App. 3d 2009)). This intention "must be shown by an express provision in the contract identifying the third-party beneficiary by name or by description of a class to which the third party belongs." *Id.* So, "under basic principles of contract law, only parties to the arbitration contract may compel arbitration." *Guarantee Tr. Life Ins. Co. v. Platinum Supplemental Ins., Inc.*, 2016 IL App (1st) 161612, ¶ 38 (quoting *Carter v. SSC Odin Operating Co., LLC*, 2012 IL 113204, ¶ 55).

Here, the parties to each of the four contract types are the putative class members and ASAP. [237] at 98, 194, 202, 209. None of the four contract types at issue designate ASAP's officers, directors, or agents as third-party beneficiaries who would be entitled to enforce the arbitration or class-waiver provisions. That means that Petrosius cannot enforce the provisions in contract types 3, 6, 7, and 8, and they don't apply to putative class members' claims against her. Further, contract types 1, 4, and 5 contain no arbitration or class-waiver provisions at all. That means that only type 2 contracts, which contain arbitration and class-waiver provisions that refer to ASAP's "officers, directors and agents," [237] at 71, present the adequacy problems discussed above when applied to claims against Petrosius. And their exclusion presents no numerosity problem; there would still be 51 members of the TILA class and 402 members of the IWPCA class with claims against Petrosius.

Defendants cite three cases—from 1986, 1996, and 2001—to support their position that Petrosius should also benefit from the arbitration and class-waiver provisions in class members' agreements with ASAP. The Court needn't consider those cases, which are out of date. They predate *Arthur Andersen*, 556 U.S. at 624, and the numerous Illinois cases stating that only parties to a contract can enforce those contracts' arbitration and class-waiver provisions, *see, e.g.*, *Guarantee Tr. Life Ins. Co.*, 2016 IL App (1st) 161612.

Since Malone and Brown cannot adequately represent class members in their claims against ASAP but can represent class members, except for those who signed type 2 contracts, in their claims against Petrosius, the rest of the Court's analysis will

assume that the classes exclude individuals who signed type 2 contracts and that the class members are only bringing claims against Petrosius.[5]

## 2. Other adequacy issues

Defendants contend that Malone is an inadequate representative for the TILA class because the TILA applies only when an owner of equipment leases the equipment to a carrier, 49 C.F.R. § 376.1–.2, and Malone did not own any equipment or lease any equipment back to ASAP. [253] at 9. But plaintiffs argue, and the Court agrees, that this is a question for summary judgment or trial, not for class certification. [265] at 15. Plaintiffs contend that whether Malone owned or leased his equipment to ASAP for purposes of TILA depends on his lease agreement with ASAP, which is the same basis on which all TILA class members' owner and lessor statuses will be evaluated. [265] at 14–15. So this issue creates no "antagonistic or conflicting claims" that destroy adequacy. *Retired Chi. Police Ass'n*, 7 F.3d at 598; *cf., e.g., Magpayo v. Advocate Health and Hosps. Corp.*, Case No. 16-cv-01176, 2018 WL 950093, at *15 (N.D. Ill. Feb. 20, 2018) ("The question is … whether, given [putative class members'] varying agreements, a common *answer* to the question … would move this case forward.") (citing *Wal-Mart*, 564 U.S. at 359).

---

[5] Plaintiffs propose modifying the class definitions by excluding drivers who entered into Type 2 contracts. [265] at 22. The Court, however, is not limited to the modifications proposed by the parties. *See, e.g.*, *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1023 (7th Cir. 2018) ("District courts may amend class definitions either on motion or on their own initiative."); *Streeter v. Sheriff of Cook Cnty.*, 256 F.R.D. 609, 611 (N.D. Ill. 2009) ("A district court has broad discretion to certify a class and may modify a proposed class definition if modification will render the definition adequate."); *Walney v. SWEPI LP*, Civil Action No. 13-102 Erie, 2015 WL 5333541, at *29–30, 32 (W.D. Pa. Sept. 14, 2015) (certifying classes with respect to some claims but not others and collecting cases).

Defendants contend that Malone and Brown are also inadequate representatives of the IWPCA class because plaintiffs' proposed definition of that class includes individuals who had money deducted from their paychecks for eight different reasons, while Malone and Brown only had money deducted for four of those reasons and only described those four reasons in the operative complaint. [253] at 12–13. But defendants do not explain, nor does the Court see, how this creates the type of intra-class conflict that would make Malone and Brown inadequate class representatives. *See Retired Chi. Police Ass'n*, 7 F.3d at 598.

Defendants next argue that Malone and Brown cannot adequately represent the IWPCA class because Malone claims that he and some class members are owner-operators, while Brown and other class members are not. [253] at 14. The argument is that the IWPCA protects employees, not independent contractors. *Id*. It uses a three-part test to determine whether a party is an independent contractor and not an employee, and, according to defendants, proving that owner-operators are independent contractors requires different facts than proving that other drivers are. *Id*. Again, the Court does not see how this creates an intra-class conflict leading to adequacy problems, *see Retired Chi. Police Ass'n*, 7 F.3d at 598, especially in light of plaintiffs' assertion that they can use common evidence—defendants' employment policies—to prove that all class members are employees under IWPCA, [265] at 15.

Defendants' last argument against adequacy is that Brown cannot adequately represent the putative IWPCA class because he worked for some time as a recovery

driver[6] for ASAP and for Forsage, another motor carrier. [253] at 15–16. Plaintiffs, on the other hand, argue that Brown's recovery work for ASAP and Forsage does not change the fact that he worked as a driver hauling loads for ASAP for over a year before starting his recovery work. The Court agrees with plaintiffs. Brown started working as a delivery driver for ASAP in September 2020, [236-11] at 37, which he did exclusively for over a year before performing any recoveries for ASAP, *id.* at 115. The delivery work that Brown performed for ASAP and on which his IWPCA claim is based is the same as the delivery work on which plaintiffs intend to base the claims of other putative class members. *See* [265] at 16. Brown's additional work as a recovery driver does not somehow change the nature of his work as a delivery driver, and it does not somehow make him an inadequate representative of the putative IWPCA class. *See Retired Chi. Police Ass'n*, 7 F.3d at 598.

Besides the issues related to arbitration and class-waiver provisions discussed above, named plaintiffs have demonstrated that they will be adequate class representatives. They have responded to written discovery, prepared for and attended their depositions, and regularly communicate with class counsel. [236-12] at ¶ 6.

### 3. Adequacy of counsel

Defendants do not challenge the adequacy of plaintiffs' attorneys to represent the putative classes, and the Court concludes that plaintiffs' counsel is adequate. The Court sees no apparent conflict between plaintiffs' counsel and the class, and

---

[6] A "recovery driver" is a driver who recovers new or abandoned ASAP trucks and drives them back to ASAP's truck yard, as opposed to delivering cargo from point A to point B. [236-11] at 106–08.

20

plaintiffs' counsel notes their significant experience in similar litigation. *Id.* at ¶¶ 4–5.

Adequacy is therefore satisfied for both classes as modified by the exclusion of claims against ASAP and the exclusion of individuals who signed type 2 contracts.

### B. Typicality

Rule 23's typicality requirement permits class certification only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). To satisfy typicality, plaintiffs' claims must "arise from the same events or course of conduct that gives rise to the putative class members' claims." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1026 (7th Cir. 2018). The individual claims may feature some factual variations as long as they "have the same essential characteristics." *Id.* The purpose of the typicality requirement is to ensure that class representatives' claims will not fail or prevail for reasons inapplicable to other class members. *See CE Design Ltd.*, 637 F.3d at 724. Accordingly, "[t]ypicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members." *Id.* (quoting *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996)). A court's determination in this regard is only preliminary. *Beaton*, 907 F.3d at 1026.

Malone argues that he is typical of the TILA class because he claims, like other members of the TILA class, that he "worked for ASAP and signed one of the relevant equipment lease agreements, and ASAP paid him less than the promised 82% of the load." [236] at 18. Likewise, Malone and Brown argue that they are typical of the IWPCA class because their claims that "ASAP … made deductions from [their] pay

without complying with the IWPCA's rules for obtaining employees' written authorization" are the same as those of other IWPCA class members. *Id.* The Court agrees that Malone's and Brown's claims are typical of the proposed classes.

Defendants make three arguments against typicality, none of which are persuasive. First, they argue that the putative TILA and IWPCA classes fail because some putative class members have arbitration and class-waiver agreements with ASAP. [253] at 5. But, now that the classes are to be modified as discussed in the adequacy section above, this argument no longer applies.

Second, defendants believe that the putative IWPCA class fails because some putative class members claim to be owner-operators, while others are company drivers; this could create factual differences affecting the determination of class members' status as employees under the IWPCA. *Id.* at 15. For the same reason that the distinction between owner-operators and company drivers does not affect the adequacy of plaintiffs' representation, it does not affect typicality: Plaintiffs intend to use common evidence—defendants' employment policies—to prove that all class members are employees under IWPCA. [265] at 15. So any factual differences stemming from the distinction do not affect the "essential characteristics" of class members' claims. Fed. R. Civ. P. 23(a)(3).

Third, defendants attempt to paint type 7 contracts, which are part of the TILA class, as atypical of the other contract types—1, 3, and 4—in the TILA class. [253] at 23–24. They start by asserting that type 7 drivers are not "owner-operators" entitled to TILA protection. [253] at 23. This argument fails for two reasons. First, the only

22

substantial evidence that defendants provide to support their assertion is the deposition testimony of ASAP's accountant in which she insists on using different terminology to refer to type 7 drivers and types 1, 3, and 4 drivers.[7] [253] at 23; [253-10] at 28–31. But the terminology that the accountant uses to refer to those drivers does not bear on whether type 7 drivers are "owner-operators" under the TILA. Second, whether type 7 drivers are "owner-operators" does not change the fact that type 7 drivers' claims "rise from the same events or course of conduct that gives rise to [other] putative class members' claims." *Beaton*, 907 F.3d at 1026. Plaintiffs allege that *all* TILA class members, including type 7 drivers, had money skimmed from their paychecks. [236] at 7–10.

Defendants also attempt to distinguish type 7 drivers from other members of the putative TILA class by pointing out that type 7 drivers were paid 30%–33% of the price of each load they transported, while other members of the TILA class were paid 82% of the price of each load. But the core allegation giving rise to the TILA claim is that ASAP skimmed money from drivers' paychecks by lying to them about the price of each load. [236] at 9. That "course of conduct" operates the same way whether the driver is to be paid 30% or 82% of the price of the load. *Beaton*, 907 F.3d at 1026. What matters is that the driver's compensation is a percentage of the load price—not

---

[7] Defendants also cite the declaration of defendant Petrosius. [253] at 23. But, according to that declaration, *none* of the drivers in the TILA class are owner-operators. *See* [181-1] at 3, ¶ 6. It is thus unclear how the declaration would undermine the typicality of the TILA class. Another citation appears to be intended to identify specific lines of deposition transcripts but points to a document that is not a deposition transcript and doesn't include line numbers. [253] at 23. The Court reminds defendants that "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

what that percentage is. The difference in percentage, then, does not destroy the typicality of the TILA class.

Finally, defendants point out that type 7 drivers have language in their contracts that other putative TILA class members don't have: "It is Contracotrs [sic] duty to review the settlement to verify that there are no clerical errors, Contractor has two weeks to challenge the amounts paid for each and every shipment." [253] at 23; [237] at 207. They argue that this language provides a unique defense against type 7 drivers' claims that destroys the typicality of the TILA class. But "[t]ypicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members." *Wagner*, 95 F.3d at 534. And, as discussed above, TILA class members' claims all arise from the same alleged course of conduct. *Beaton*, 907 F.3d at 1026.

Further, the typicality (and adequacy) requirement is not intended "to derail legitimate class actions by conjuring up … insubstantial defenses." *CE Design Ltd.*, 637 F.3d at 728. Unlike the arbitration and class-waiver defenses discussed above, this contractual provision does not clearly preclude type 7 drivers from participating in this putative class action. The two-week challenge period provided for in the contract is connected to the previous clause—"It is Contracotrs [sic] duty to review that settlement to verify that there are no clerical errors"—with a comma. [237] at 207. The two-week challenge period thus appears to refer to the opportunity to object to "clerical errors." *Id*. Since plaintiffs allege that defendants intentionally lied to

them about the prices of their loads, [236] at 9, the claims here are outside the scope of the "clerical errors" to which the challenge period applies, [237] at 207.

Defendants cite *Mervyn v. Atlas Van Lines, Inc.*, 882 F.3d 680 (7th Cir. 2018), to support the supposed gravity of the purported challenge-period defense. In that case, the plaintiff had a contract that stated that "[f]inancial entries made by [defendant] on payment documents shall be conclusively presumed correct if not disputed by [plaintiff] within 30 days after distribution." *Id.* at 684. The plaintiff alleged that the amount he was paid violated the terms of his contract, even though that amount—and the information upon which the amount was based—was accurately stated on his payment documents. *Id.* at 684–85. The court dismissed his claim because he didn't dispute his payments within 30 days. *Id.*

Here, in contrast, the crux of plaintiffs' TILA claims is that their payment documents did *not* accurately state the load prices upon which their payment was based. [236] at 9. And since the contractual two-week challenge period refers to "clerical errors," [237] at 207, it does not preclude type 7 drivers from suing for intentionally falsified payment records, *see* [236] at 9. The challenge-period defense is thus an "insubstantial defense" that needn't "derail" this class action. *CE Design Ltd.*, 637 F.3d at 728.

Typicality is satisfied for both modified classes.

## C. Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impractical." The Seventh Circuit has instructed that "[w]hile there is no

25

magic number that applies to every case, a forty-member class is often regarded as sufficient to meet the numerosity requirement." *Mulvania*, 850 F.3d at 859.

Here, the proposed TILA class, excluding drivers who signed type 2 contracts, contains 51 drivers. *See* [236] at 20; [237] at 229. The proposed IWPCA class, excluding type 2 drivers, contains 402 drivers. *Id.* Both classes have more than forty members, satisfying the numerosity requirement. *See Mulvania*, 850 F.3d at 859.

Defendants argue that the proposed classes fail the numerosity requirement because only 27 drivers are not subject to arbitration or class-waiver provisions. [253] at 24. But after modifying the proposed classes as discussed above to exclude claims against ASAP and exclude type 2 drivers, none of the putative class members are even arguably subject to arbitration or class-waiver provisions. So there are 51 members in the TILA class, not 17, and 402 members in the IWPCA class, not 27.

Numerosity is satisfied for both modified classes.

### D.     Commonality and Predominance

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." The key is "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (cleaned up). Put another way, the Court must determine if the question is "capable of proof at trial through evidence that is common to the class rather than individual members." *Bell*, 800 F.3d at 375 (quoting *Messner*, 669 F.3d at 818). A single common question of law or fact is sufficient to establish commonality, *id.* at 374, and the Court need not resolve that question at this point, *id.* at 376. Rather, plaintiffs must merely demonstrate that a question susceptible to class-wide resolution exists. *Id.* at 375.

Further, under Rule 23(b)(3), the common questions of law or fact must "predominate over any questions affecting only individual members. *See Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1059 (7th Cir. 2016). A common question predominates when "a failure of proof on the common question would end the case and the whole class will prevail or fail in unison." *Bell*, 800 F.3d at 378 (cleaned up).

The Court's commonality analysis begins with an identification of the elements of plaintiffs' claims. *See Eddlemon v. Bradley Univ.*, 65 F.4th 335, 339–40 (7th Cir. 2023) (by identifying the elements of a plaintiff's claims, a court can "better understand the relationship between each claim's common and individual questions").

### 1.    TILA Class

TILA enables owner-operators to bring a private cause of action against carriers to enforce their legal rights under TILA. 49 U.S.C. § 14704(a); *Mervyn*, 882 F.3d at 682. A successful TILA claim requires proof that the defendant violated one or more regulations promulgated under TILA. *See Brant v. Schneider Nat'l*, 43 F.4th 656, 678 (7th Cir. 2022). TILA regulations require leases between owner-operator drivers and motor carriers to specify the amount that the carrier will pay the driver for the services provided. 49 C.F.R. § 376.12(d). They also require the carrier to adhere to the compensation amount specified in the lease. 49 C.F.R. § 376.12 (introductory paragraph). And they provide that "[n]o person shall aid, abet, encourage, or require a motor carrier or its employees to violate" the TILA or its regulations." 49 C.F.R. § 390.13.

27

Plaintiffs assert that commonality is satisfied as to the TILA class because "[t]he fundamental question … is whether ASAP agreed to pay drivers a percentage of the broker rate for each load, and the answer to that question will be the same for each class member." [265] at 10. The Court agrees. Commonality is satisfied when a "common answer apt to drive the resolution of the litigation," *Dukes*, 564 U.S. at 350, is "capable of proof at trial that is common to the class," *Bell*, 800 F.3d at 375. Here, plaintiffs intend to show that the contracts of members of the TILA class should be construed as agreements to "pay drivers a percentage of the broker rate for each load." [265] at 9–10. Because the relevant language of TILA class members' contracts is materially the same, that construction is susceptible to proof by common evidence. *See Foster v. CEVA Freight, LLC*, 272 F.R.D. 171, 174 (W.D.N.C. 2011) (finding commonality because class claims all arose under TILA and involved "uniform provisions contained within their respective operating agreements").

Defendants argue, however, that the relevant language in class members' contracts is *not* materially the same. [253] at 16, 18. The putative TILA class (as modified) includes drivers who signed type 1, 3, 4, and 7 contracts. The relevant language is as follows.

Type 1 contracts:

For … performance of each Trip … Carrier agrees to pay the contractor the compensation listed in this agreement in the form of specified percentage [82%] based on the agreed (verbally or written) adjusted revenue rate for a line haul between the Carrier and the Contractor.

[237] at 28.

Type 3 contracts:

> For … performance of each Trip … Carrier agrees to pay Contractor the compensation listed in the form of a specified percentage [82%] based on the agreed exclusively between the Carrier and the Contractor line haul rate.

[237] at 118.

> Type 4 contracts:

> For … performance of each Trip … Carrier agrees to pay the contractor the compensation listed in this agreement in the form of specified percentage [82%] adjusted gross revenue rate for a line haul between the Carrier and the Contractor.

[237] at 163.

> Type 7 contracts:

> Carrier agrees to pay Contractor 33% of amount negotiated between Carrier and Contractor. Carrier shall inform either verbally or through a communication device about the amount each shipment will pay to Contractor and Contractor will either agree or decline to transport each and every shipment. After agreement is made Carrier shall pay the Contracor [sic] agreed percentage of the agreed price.

[237] at 207.

The differences among the provisions are not material. The only specific difference that defendants identify is that the type 3 contracts contain the word "exclusively." That is not significant enough to disturb commonality. In all four contract types, the carrier is required to pay an "agreed" "price" or "rate" for a "shipment" or "line haul," and the crux of plaintiffs' argument is that the "agreed price" or "agreed rate" should be construed as the "broker rate," i.e., the amount paid to the carrier by the buyer of the shipment. [236] at 8–9. Plaintiffs assert that they will support this construction using common authorities and proof, including industry practice and evidence of common practice among ASAP dispatchers. [265] at 9; [235]

29

at 4–5; [236-5] at 44:10–45:19. After reviewing the evidence, the Court agrees that this construction is susceptible to common proof. *See, e.g.*, [236-5] at 44:10–45:19.

Defendants also spend several pages arguing that the evidence shows that the contracts should not be construed in the way that plaintiffs propose. [253] at 18–22. That is an argument for summary judgment or trial, not class certification. It gets to the heart of plaintiffs' TILA claims, and class-certification proceedings are not a "dress rehearsal for the trial on the merits." *Messner*, 669 F.3d at 811; *see In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 604 (7th Cir. 2020) ("At class certification, the issue is not whether plaintiffs will be able to prove these elements on the merits, but only whether their proof will be common for all plaintiffs, win or lose.").

Turning to predominance, defendants identify one individualized question that they say will predominate over the common questions. They assert that drivers' compensation was to be based on the rate "agreed to by the driver and ASAP per load hauled," [253] at 22, so "what agreements were reached with each driver ... will need to be assessed on a member by member basis." *Id.* This, they continue, would require "an analysis of communications by and between different dispatchers and each potential class member at different time periods." *Id.* But this argument assumes that each driver's compensation was based on a rate agreed to by the driver and the dispatcher. And that assumption is the opposite of what plaintiffs intend to prove, which is that each driver's compensation was to be based, under plaintiffs' proposed contractual construction, "on the rate the broker paid ASAP for each load." [265] at

10. This individualized question, then, is based on a fundamental misunderstanding of plaintiffs' claims and will not predominate over common questions.

Plaintiffs, for their part, point out that they intend to prove a common pattern of underpayment using centralized data. [265] at 10; [236] at 10. They identified a spreadsheet that ASAP used to track, for each driver, how much the broker paid for the load and how much ASAP told the driver the broker paid for the load. [236] at 10; [236-9] at ¶ 6; [263-4] at 43:11–44:15; [263-5] at 36–46; [237] at 1 ¶ 2. This centralized data can be used to determine whether there was a pattern of underpayment, whether each driver was underpaid, and by how much, [265] at 10, thus minimizing the time and effort needed to resolve individual questions. Defendants do not identify, and the Court does not see, any other individualized questions that will predominate over common questions.

Commonality and predominance are satisfied as to the TILA class.

### 2. IWPCA class

The IWPCA prohibits deductions from employees' wages unless the deductions are—

> (1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; or (4) made with the express written consent of the employee, given freely at the time the deduction is made.

820 ILCS 115/9.

It applies to "employees," which it defines broadly as "any individual permitted to work by an employer." 820 ILCS 115/2. It does, however, exclude independent contractors. It provides a three-part test for determining whether a worker is an

independent contractor; for the exclusion to apply, all three elements must be satisfied. Under the test, an independent contractor is a person—

> (A) who has been and will continue to be free from control and direction over the performance of his work, both under his contract of service with his employer and in fact; and
>
> (B) who performs work which is either outside the usual course of business or is performed outside all of the places of business of the employer unless the employer is in the business of contracting with third parties for the placement of employees; and
>
> (C) who is in an independently established trade, occupation, profession or business.

820 ILCS 115/2.

Plaintiffs have identified two questions that they believe are susceptible to common proof, satisfying the commonality requirement: whether ASAP's drivers were "employees" under the IWPCA; and whether ASAP's standard forms provided adequate written authorization for the deductions for purposes of the IWPCA. [236] at 16; [265] at 11–12. The Court agrees that the first question satisfies the commonality requirement and that the second question, at the very least, is not an individualized question that will predominate over common questions.

Plaintiffs intend to establish that class members were "employees" under the IWPCA by showing that they do not satisfy parts A or B of the IWPCA's independent-contractor test. *Id.* They will use ASAP's standard written work rules to establish that class members were not "free from control and direction over the performance of [their] work," 820 ILCS 115/2(A), thus failing part A of the test. [236] at 11–12. Whether the drivers were free from control, then, is susceptible to class-wide proof. *See Vera v. HomeDeliveryLink, Inc.*, No. 23 CV 14278, 2025 WL 20468, at *3 (N.D. Ill.

Jan. 2, 2025) ("Whether or not the policies reflected in [the drivers' standard] documents governed the class is capable of class-wide resolution. They either did or they didn't."). They will also use common proof to demonstrate ASAP's "usual course of business" and its "places of business," two key questions in determining whether workers satisfy part B of the test. [236] at 12; *see Vera*, 2025 WL 20468, at *3 (finding that drivers satisfied commonality for part B because defendant's "usual course of business" and "place of business" would not vary by driver).

They also intend to use common evidence—deductions listed on pay records and standardized documents that purportedly authorize those deductions—to determine whether ASAP obtained class members' written consent to make certain deductions from their paychecks. [236] at 12. Because these documents will either show drivers' consent or they won't, their consent is a common question susceptible to common proof. *See, e.g.*, *Torres v. Nation One Landscaping, Inc.*, No. 12 CV 9723, 2014 WL 5350440, at *3 (N.D. Ill. Oct. 21, 2014) ("It appears that an Employee Policy Manual disclosed the deductions and employees signed the manual. The issue of whether the deductions were lawful is amenable to resolution across employees.").

Defendants contend that the evidence needed to prove that drivers consented to deductions varies depending on which contract type each plaintiff signed. [253] at 22. But they do not identify any evidence supporting this assertion. And, even if drivers' consent were not a common question, drivers' employee status would still be. Commonality requires only one common question the answer to which "will resolve

an issue that is central to the validity of each claim." *Chi. Teachers Union v. Bd. Of Educ.*, 797 F.3d 426, 434 (7th Cir. 2015).

Regardless of whether class members' consent is susceptible to common proof as argued by plaintiffs, it is not an individualized question that will predominate over the common question of drivers' employee status. That is true even if, as defendants argue, the evidence needed to prove or disprove consent will depend on the contract type. There are only seven contract types now at issue in this case (after the exclusion of type 2 contracts). The analysis will differ only to the extent that contract language regarding deductions varies across contracts. That means that there will be, at most, seven different consent analyses. That is not an individualized issue, and it doesn't predominate over common questions. *See Tsybikov v. Dovgal*, Case No. 19 C 3334, 2022 WL 1238853, at *4 (N.D. Ill. 2022) (finding predominance despite differences in drivers' authorizations, some of which were made by email and no longer existed). Defendants do not identify, and the Court does not see, any other individualized questions that will predominate over common questions.

Commonality and predominance are satisfied as to the IWPCA class.

## E.    Superiority

Class certification is only permitted under Rule 23(b)(3) if "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs meet that standard here. Individual claims are relatively small in value, many of which are worth less than $5,000, [236]

at 25.[8] *See Hughes v. Kore of Ind. Enter. Inc.*, 731 F.3d 672, 675 (7th Cir. 2013) ("The smaller the stakes to each victim of unlawful conduct, the greater the economies of class action treatment and the likelier that the class members will receive some money rather than (without a class action) probably nothing."). Further, class members reside all over the country, so litigating their suits individually would be a drain on the judiciary. Resolving this matter on a class basis would therefore "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Fed. R. Civ. P. 23(b)(3) advisory committee's note to 1966 amendment).

The Court further finds no issues with class certification under the Rule 23(b)(3) factors: neither party has articulated a significant interest in individual control of the prosecution or defense of separate actions; the Court is unaware of any existing litigation involving these parties; the Northern District of Illinois is an adequate forum for a class of drivers who contracted with an Illinois company; and similar class actions are regularly handled by federal courts.

---

[8] Defendants contest this figure by suggesting that the average value of each claim is in the low five figures based on plaintiffs' settlement demand. [253] at 25. This argument is unpersuasive for three reasons. First, settlement demands may not be used as evidence under Federal Rule of Evidence 408. Second, even figures in the low five figures may be insufficient to incentivize litigation. Third, bringing hundreds of individual lawsuits that duplicate many of the same facts and legal issues would be a waste of judicial resources regardless of the claims' value.

## IV.    Conclusion

The motion to certify two classes [231] is granted with modifications. The classes are certified as follows:

**TILA/Breach of Contract Class**

All individuals who drove a truck for ASAP from January 1, 2021, to January 1, 2024, and signed an equipment lease in the form found at Bates Numbers ASAP014600–644 (Type 1); ASAP014692–734 (Type 3); ASAP014735–780 (Type 4); or ASAP 014796–803 (Type 7), with respect to claims against defendant Petrosius.

**IWPCA Class**

All individuals who worked for ASAP as a truck driver from January 1, 2018, to January 1, 2024, and had amounts deducted from their pay for occupational accident insurance, escrow, electronic logbook monitoring, admin fee, violations, citations, repairs, or truck cleaning, excluding individuals who signed a contract in the form found at Bates Numbers ASAP014645–691 (Type 2), and only with respect to claims against defendant Petrosius.

The Court appoints Malone as class representative of the TILA/Breach of Contract Class and Malone and Brown as class representatives of the IWPCA class. It appoints Hughes Socol Piers Resnick & Dym, Ltd. as class counsel for both classes.

The parties are directed to appear for a status hearing on November 13, 2025 at 9:00 a.m. to discuss next steps in this litigation. By November 6, 2025, the parties are directed to submit a joint status report proposing those next steps and addressing the possibility of settlement.

_____
Georgia N. Alexakis
United States District Judge

Date: 10/22/25